UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CORY SIMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.  4:10CV1257 TIA |
| ) | |
| GREIF, INC. and TRILLA ST. LOUIS CORP., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants Greif, Inc. and Trilla St. Louis Corp.'s Motion for Summary Judgment (Docket No. 26).  Plaintiff Cory Sims filed a Memorandum in Opposition (Docket No. 30).  Defendants filed Reply (Docket No. 36) thereto.  All matters are pending before the undersigned United States Magistrate Judge, with the consent of the parties, pursuant to 28 U.S.C. § 636(c).

Plaintiff Cory Sims filed the underlying action in the Circuit Court of the City of St. Louis on May 5, 2010, alleging he was unlawfully terminated in retaliation for bringing to Occupational Safety and Health Administration's ("OSHA") attention that Defendant Greif, Inc. ("Greif") was potentially in violation of safety procedures.

The Eighth Circuit Court of Appeals recently clarified the appropriate standard for consideration of motions for summary judgment as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a

> genuine issue for trial.  On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.  Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial.  Where the record is taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Trogerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. June 1, 2011) (en banc) (citations and quotations omitted).  The Eight Circuit further opined "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." Id. at 1043.

**The Undisputed Evidence before the Court on the Motion**

Viewing all facts and drawing all reasonable inferences in the light most favorable of the nonmoving party, A. Brod, Inc. v. SK & I Co., L.L.C., 998 F. Supp. 314, 320 (S.D.N.Y. 1998) the Court sets forth the following facts.  However, while this Court must view the facts in the light most favorable to Sims, "it is not required 'to accept unreasonable inferences or sheer speculation as fact.'" Reed v. City of St. Charles, Mo., 561 F.3d 788, 791 (8th Cir. 2009) (quoting Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004)).

**1. Background**

Greif, Inc. ("Greif"), a world leader in industrial packaging products, produces steel, plastic, fibre, flexible and corrugated containers, packaging accessories and container board, and provides blending, filling, and packaging services for a wide range of industries.  (Exh. 1, Decl. Cahail at ¶ 2).

On April 12, 2007, Plaintiff Cory Sims ("Sims") started working in a general labor position

for Trilla St. Louis ("Trilla") in Fenton, Missouri.  (Pltf.'s Depo. at 80).  The Trilla plant which later became a Greif plant manufactured steel drums.  (Id. at 81).  In August 2007, Sims started training as a punch press operator and in that role he operated a machine that punched holes into the steel drum lids by driving steel flanges into the drum lids.  (Id. at 80-82).  The punch press operator job required the operator to adhere to safety guidelines established by the plant.  (Id. at 82-83).  Sims agreed that if the operator inserted his hand instead of a lid, there is a good chance the operator could lose his hand.  (Id. at 82).  Sims acknowledged that he "had never operated a machine of that magnitude, but I know it was a serious piece of equipment.  It's not anything you want to take any chances with or not be paying attention fully on the job."  (Id. at 83).  Sims agreed that following safety procedures in operating the punch press was important.  (Id.).

After purchasing Trilla in the summer of 2008, Greif assumed operations of the Fenton, Missouri plant where Sims worked.  (Pltf's at 38).  Sims' position and job duties as a punch press operator did not change when Greif took control.  (Id. at 83).  Greif distributed Company Policies and Practices including the Fair Treatment of Employees to employees after assuming control of the plant in June 2008.  (Id. at 84; Exh. 2).  The Fair Treatment of Employees policy sets out a prohibition against retaliation and Greif's open door policy inviting any associate to contact human resources or corporate human resources if the employee has a problem or an issue with someone or something as a Greif employee.  (Exh. 2).  Although Sims acknowledged that under the policy he could contact human resources or corporate human resources if he had a problem regarding his employment at Greif, Sims never contacted anyone during or after his employment to discuss any issues or to lodge any complaints about things going on at the plant.  (Pltf's Depo. at 85-86).

During the time Sims worked for Trilla, there was no guard in front of or around the punch

press. (Pltf's Depo. at 97; Exh. C at DO366). In the U.S. Department of Labor issued a Citation and Notification of Penalty dated September 29, 2009 stemming from the inspection on July 22, 2009 of the Greif plant, the following is noted in the Employer Knowledge section: "The employer had an audit in May 2009 and the tri-sure press was identified as not having a guard. The employer immediately fabricated an aluminum guard...." (Exh. C at DO366). Sims testified that in May 2009, Greif installed temporary physical guards around the punch press machine to cover the point of operation to prevent an operator from diving into the machine. (Pltf's Depo. at 97-99). The temporary guarding only covered the point of operation, i.e., the area of the machine where the lid comes into contact with the press. (Id. at 98-99).

In June 2009, a representative of TriSure, the manufacture of the punch press machine Sims operated, came to the plant to perform maintenance on the machine. (Exh. A at ¶ 8).       I

### 2. Greif Safety Rules

In January 2008, Greif distributed a copy of Greif Safety Rules to Sims. (Pltf's Depo. at 87-88). The Safety Rules provide that "[f]actory management and employees are responsible for implementing the necessary measures to protect people, property and resources." (Safety Rules; Exh. 3 at 3). One of the examples of a serious safety violation is operating equipment without guards. (Id.). The Safety Rules prohibited operating equipment without guards, required the operators to "[k]eep all guards and safety devices in place and properly adjusted," and "not alter, modify or disable safety devices." (Pltf's at 89, 91; Safety Rules; Exh. 3 at 3, 10). The Safety Rules provide that "[f]ailure to abide by these rules and/or instructions will subject an employee to discipline, up to and including discharge upon the first offense." (Exh. 3 at 3). Sims acknowledged that he understood that a violation of a safety rule, including operating equipment without guards, could result in

disciplinary action, up to and including immediate termination of employment. (Pltf's Depo. at 88-90). Sims further acknowledged that the Safety Rules prohibited wearing "[c]ut off tee shirts or other shirts exposing large areas of skin," "throwing objects," and bringing "cellular phones ... in production or shop areas." (Pltf's Depo. at 89-90; Exh. 3 at 7,10).

The Safety Rules prohibited tobacco use in production areas, and the Tobacco-Free Policy for all Fenton Employees prohibited any tobacco use "inside the plant or within 15 feet of the plant." (Safety Rules; Exh. 3 at 13; Exh. 4,Tobacco-Free Policy for all Fenton Employees). Sims acknowledged that he understood that the Tobacco-Free Policy prohibited any tobacco use inside the plant or fifteen feet of the plant, and a violation of the policy could result in disciplinary action, up to and including termination of employment. (Pltf's Depo. at 92-93).

**3. Disciplinary Actions**

On October 30, 2008, T. Shaw, Sims' supervisor, issued a disciplinary action, a three-day suspension, for Sims' smoking in a prohibited area (Pltf's Depo. at 106;Exh. H, Disciplinary Action). Sims served the three-day suspension without pay from October 31 through November 4, 2008. (Pltf's Depo. at 106). On December 30, 2008, T. Shaw issued a disciplinary action, a five-day suspension, for Sims wearing a sleeveless shirt in violation of Greif's Safety Rules. (Id. at 107-08; Exh. 6, Disciplinary Action). After filling a grievance related to the disciplinary action, Greif reduced the five-day suspension to a disciplinary warning. (Exh. 6).

On May 13, 2009, after being observed throwing parts in his work area on May 8 by plant manager, Heather Cahail ("Cahail"), Greif issued a disciplinary action, a notice of written warning. (Pltf's Depo. at 110-11; Exh. 7). On May 15, 2009, Anthony White, a supervisor, issued a disciplinary action, a one to three day suspension for improper use of a cell phone after his phone rang

during morning meeting sounding his music ring tone.  (Pltf's Depo. at 114; Exh. 8).

Greif's progressive discipline policy is a four-step progressive discipline policy, pursuant to which an employee is suspended, then terminated after the fourth offense in a twelve-month period. (Exh. 1, Cahail Dec'l at ¶ 13).

### 4. OSHA Complaint and Inspection

In July 2009, Sims contacted an inspector at the Occupational Safety and Health Administration ("OSHA") regarding the operations of the Greif facility and filed an anonymous complaint regarding the unsafe condition of the punch press machine.  (Pltf's Depo. at 116; Exh. C).

In the OSHA Safety Report based on the inspection of Greif on July 22, 2009, the inspector noted in the Safety Narrative as follows:

> Inspection conducted as a result of a complaint.  Company makes Steel Drums that are shipped throughout the US.  After the purpose and the scope were explained, the plant manager provided copies of 300 logs for 2006-2009.  She indicated that she and two others from the company attended an OSHA 30 hour course in May 2009 that was hosted by Greif.  After the course she asked the inspector to do an audit of the entire plant. Several hazards were identified and the company has made improvements costing in excess of 1 million dollars.  The punch press identified in the complaint was identified during the audit as not having a side guard.  A temporary aluminum guard was installed fabricated in house and installed immediately.  She also ordered a permanent guard to be installed once it is received from the mfg out of CA.  The operator of the press sustained lacerations during change cut operations from the sharp edges of the temporary guard.  The operator reported the lacerations to the superintendent and a plastic covering for the sharp edges was installed. Over a period of time the plastic covering has become loose and portions of it have since fallen off of the guard, again exposing the operator to the sharp edge of the guard.  According to the plant manager, the permanent guard should arrive within the next 1-2 weeks and it will be installed immediately.  It consist[*sic*] of a mat and light curtain configuration.

(Exh. C at DO358).

An OSHA inspector visited the Fenton, Missouri plant on July 22, 2009 and after inspecting some other areas of the plant, the inspector questioned Sims about the punch press machine he was

- 6 -

operating. (Pltf's Depo. at 120). The inspector apprised Cahail that "the purpose of her visit was to do an inspection of the temporary guarding on the Tri-Sure press as a result of an anonymous employee complaint of sharp edges and lacerations." (Exh. B). In the Notice of Alleged Safety or Health Hazards, the inspector described the alleged hazard as follows: "The Tri-sure punch press has been guarded with a temporary guard that results in lacerations to workers who operate or are required to service the machine." (Exh. C at DO356). Sims testified that he did not know how long the OSHA inspector had been in the plant before talking to him. (Pltf's Depo. at 120-21). Cahail and Charles Albert accompanied the inspector to Sims' machine and introduced Sims to the inspector. (Id.). After introducing the inspector, Cahail indicated that the inspector wanted to talk to Sims about his machine. (Id. at 121). Sims testified that Cahail did not attempt to stop him from speaking with the OSHA investigator, and Sims and the inspector went into an empty office made available by Cahail and talked for about twenty minutes. (Id. at 121-22). During the conversation, Sims expressed his concerns about operating the press punch machine with the temporary guards, and the OSHA inspector apprised Sims that Cahail indicated to her that permanent guards would be installed in two weeks. (Id. at 127-28). The inspector also talked to Dale, the other machine operator and the one who trained Sims, regarding the punch press machine and the temporary guard and the dangers posed to the operators. (Id. at 129).

Sims testified that he has no knowledge or information regarding what the OSHA inspector discussed with Cahail. (Pltf's Depo. at 128). Although Sims did not inform a supervisor, manager or anyone at Greif's corporate office that he called OSHA, he informed Dale Leslie, a coworker at Greif, that he made the OSHA complaint. (Id. at 118-19).

In the written OSHA inspection report, the inspector noted as follows:

- 7 -

> Employer Knowledge: The employer had an audit in May 2009 and the tri-sure press was identified as not having a guard. The employer immediately fabricated an aluminum guard; however the edges of the guard were jagged and not smooth. As a result; the operator sustained lacerations to his forearm. This was reported and the superintendent applied a plastic covering along the sharp edges of the temp guard. After a period of time some of the plastic covering became worn and peeled off; exposing the employee to the sharp edges once again. The employer has ordered a permanent guard and hopes to receive it in the next few days so that it can be installed immediately. (copy of quotation for guard in case file).
>
> Comments (Employer, Employee, Closing Conference): Employee feels that it is taking the employer too long to receive the guard and install it. The superintendent claims that he was not aware that parts of the plastic had worn off. According to the employee and the employer the temporary guard has been in place for about 2 months. The plastic covering that had been put to cover the jagged edges after the employee had complained to the Superintendent 1 month after the guard had been in place about cuts to his arm. This is when a plastic covering was applied to cover the jagged edges. Over a period of weeks, the plastic became worn and portions of the jagged edges of the guard became exposed again. That is when Mr. Sims called the OSHA office to file a complaint.

(Exh. C at DO366).

In an email dated October 22, 2009, Cahail apprised another Greif employee how the OSHA inspector did not inspect any other parts of the plant and noted:

> On July 22nd, an OSHA inspector arrived at the Fenton facility for an inspection.... She informed me that the purpose of her visit was to do an inspection of the temporary guarding on the TriSure press as a result of an anonymous employee complaint of sharp edges and lacerations.
>
> Charles Albert (Maintenance Supervisor) and Matt Regnier (Shop Steward) also participated in the initial conversation that occurred in my office. She stated the purpose of the visit and interviewed us regarding the temporary guarding. Charles and I provided the plan for safety upgrades and discussed the time line. She asked if any injuries occurred on that equipment. She also asked for recent years OSHA 300 logs and for Safety policies in place. I provided her with a copy of the Greif Safety Rules.
>
> We (Charles, Matt, and myself) accompanied her to the plant floor for the inspection. We visited the maintenance shop to show her the 3D light curtain. She took pictures of the light curtain and took the model number. We also took her to the TriSure press

- 8 -

>   where she inspected the guarding and took pictures. She interviewed operators Cory Sims and Dale Leslie regarding the guarding. Shop Steward Matt Regnier was present for some of the interview. We provided a private office for the interviews to take place.

(Exh. B).

### 5. Sims' Termination

After observing Sims operating the punch press machine without all the temporary guards properly installed on August 3, 2009, Cahail reminded Sims of her expectations when operating the machine including having the temporary guards fastened and in place. (Pltf's Depo. at 133-35). Sims explained that when operating the punch press machine the screw securing the temporary guards would fall out causing the guard to fall to the side of the machine. (Id. at 134). In response to Sims' explanation, Cahail reminded him to keep the guard fastened to the machine when operating the machine. (Id. at 134-35). Based on the conversation, Sims understood that Cahail expected him to have the guards in place when operating the punch press machine. (Id. at 135).

On August 5, 2009, Greif had installed a safety mat in front of Sims' machine. (Pltf's Depo. at 136). After working for about an hour, Sims removed the punch press machine's temporary guarding on the control side inasmuch as he assumed the permanent safety mat to be operational. (Id. at 137-39). Sims assumed the safety mat to be operational even though no one ever told him it was operational. (Id. at 136-39). About one hour after removing the first guard, Sims with the help of a coworker removed the temporary guard on the opposite side of the machine also known as the "two-inch die side." (Id. at 138-39, 141). Sims replaced the temporary guard by setting the guard in place and placing one of four or five screws to cover the no-zone. (Id. at 141, 153-54). Sims did not fully install the temporary guard on the "two-inch die side" of the machine, because the process

of putting the guard up would delay him so he just set the guard up and inserted a screw to cover the no-zone. (Id. at 153-54). Sims ran an order through the machine with one side of the guard, the control panel guard, off and the "two-inch die side" guard partially set up with one screw inserted to cover the no-zone. (Id. at 141, 154). Another employee, a maintenance worker and union steward, observed Sims operating the machine without the guarding in place on the control side and asked Sims why he was operating the machine without the temporary guards. (Id. at 141-42). Sims testified that he responded, "you're maintenance, you tell me or words to that effect." (Id. at 142).

Charles Albert ("Albert"), a maintenance technician, observed Sims operating the press punch machine without all the guards in place and reached for the main power switch to shut down the machine. (Pltf's Depo. at 144). Sims grabbed Albert's hand as he attempted to shut down the machine by turning off the power, and indicated he had it under control. (Id. at 144). Sims met with Cahail later that morning, and they discussed his operation of the punch press machine without all the temporary guards in place in violation of Greif's Safety Rules. (Id. at 146-49). Cahail apprised Sims that effective August 5, 2009, he was suspended pending termination as a result of his safety violation. (Id. at 148-49). At no point during that meeting, did Sims reference the OSHA inspector's visit to the plant in July, or did Cahail tell Sims he complained too much. (Id. at 150).

From the time the OSHA inspector visited the plant until the date of his termination on August 5, 2009, no one from management at Greif ever commented to Sims indicating Sims to be the person who had called OSHA. (Pltf's Depo. at 150). Sims testified that the only evidence he has supporting his termination to be the result of the OSHA call is "a mental thing," "the constant bumping of heads of me and Heather since she took over the plant" as demonstrated by the disciplinary notices issued to Sims among other things including her unwillingness to listen to Sims'

input regarding the safe operation of the punch press machine.  (Id. at 151, 153).

Greif terminated Sims' employment effective August 10, 2009.  (Pltf's Depo. at 54-55).

**6.  Sims' Confidential Witness Affidavit**

In his affidavit to the National Labor Relations Board, Sims averred as follows:

I was off on August 4 on vacation.  On August 5, 2000, the company had installed a mat on the floor in front of my machine.  It is a safety mat and if someone steps on the mat while the machine is running, the machine will shut down.  The temporary guard was still up.  This mat is what the company said was on backorder.  I didn't know if the mat was activated but as I worked, the machine shut down about three times and each time, the diagnostic screen didn't report what was wrong but my foot was in contact with the edge of the mat.  I assumed the mat was installed and that was the reason the machine shut down.  We have a daily meeting before work and at the meeting that day no one mentioned that the mat had been installed in my area.

After I worked about an hour, the press has shut down about 3 times.  I then decided to remove the temporary guard .  I removed it by myself around 8 a.m.  I assumed that because the safety mat had arrived, I didn't need the temporary guard anymore.

Around 9 a.m. that morning, I had a special order and had to do a changeover that required me to remove the temporary guard on the 2" die side of the machine.  This is the side opposite where the controls are.  This is the first time I had to remove the temporary guard.  There was no way I could have done this changeover with the guard there.  I went and got Matt Regnier to help me remove the guard.  We had to remove about 4 or 5 bolts and it took about 15 minutes to get the guard off.  I removed the 2" die and that took another 10-15 minutes.  I didn't get Matt to help me put the guard back on so I replaced the temporary guard and screwed one bolt in myself to hold it there for the 5 minutes ti would take me to run the order.  I then ran the order.  While the order was running, the line got held up further down the line by the washer so I had stopped to stack completed pieces until the line started moving again.

Matt came over while the special order was running and he noticed that the temporary guard was off on the controller side.  Matt asked me if the mat was operational.  I told him, "Your maint., tell me, but I told him that the machine has been shutting off when I touch the mat so I think it is hooked up.  Matt walked off.

My order finished so [*sic*] locked out/tagged out my machine and removed the temporary guard that I had up with one bolt on the 2" side.  After I removed the temporary guard again, the line started moving  aging[*sic*] so I walked around to the

- 11 -

>controller side and put the finished pieces back on the line. ...
>
>Matt and the head maintenance guy, Charles Albert, came over while I was putting the finished pieces back on the line. Charles started yelling that I was operating the machine without temporary guarding. Charles then reached for the main power switch. I grabbed his hand and told him that I had it. He didn't know that I was still in the process of my changeover. Before the main power is shut off, the control panel needs to be shut off. I told him that I had already run the order and took the guarding off. Albert then went and told Heather and I went back to work. I put the 2" die back and installed the die blocks that are the other safety feature. I don't think the company knows that I would leave the main power switch on so I could have light to see.
>
>Matt stayed and we established that the mat was not working on the controller's side. I can't explain why my machine had been shutting down.
>
>I reinstalled the temporary guard on the controller's side and Matt helped me reinstall the guard on the other side. I continued working and around sometime before lunch I went to talk to Duane. I told him that I would maybe need a day off because a friend of mine had died. I told him that I was working hard at this job and trying to do a good job. He said, "I think you just messed that up?" I asked if he was talking about the guard. I said it was basically a misunderstanding....

(Exh. A at 158-61).

## **Discussion**

At the onset, the undersigned addresses Defendants' objection to Sims' reliance on the unsworn Grievance Form on the ground that the form is not properly authenticated. Sims completed the form on August 5, 2009, after being suspended pending termination for operating equipment without a guard in violation of Greif's Safety Rules. The form is not authenticated by an affidavit made on personal knowledge or Sims' sworn deposition testimony. Without an accompanying affidavit or deposition testimony, the form contains self-serving statements which are of no probative value for purposes of summary judgment. See, e.g., DG & G, Inc. v. Flexsol Packaging Corp. of Pompano Beach, 576 F.3d 820, 826 (8th Cir. 2009) ("[t]o be considered on summary judgment,

documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e) (quoting Shanklin v. Fitzgerald, 397 F.3d 596, 602 (8th Cir. 2005)).  The Grievance Form., in its current condition is inadmissible hearsay because it contains unsworn statements. Erickson v. Farmland Indus., Inc., 271 F.3d 718, 728 (8th Cir. 2001) (noting that while a document containing attested testimony is admissible for the purpose of summary judgment, an unsworn statement is hearsay and is not cognizable on a summary judgment motion).  Sims is not entitled to rely on conclusory statements in his Grievance Form in resisting Defendants' summary judgment motion.  See Jeseritz v. Potter, 282 F.3d 542, 545-46 (8th Cir. 2002) (holding that the plaintiff could not rely on conclusory statements in his affidavit to establish a genuine issue of material fact).  Thus, the Court will not consider the assertions set forth in the Grievance Form inasmuch as this unsworn testimony is at odds with Sims' sworn testimony in his deposition.

A.         Missouri's Employment At-Will

Generally, in Missouri, an employer can terminate an employee "for any reason or for no reason." Margiotta v. Christian Hosp. Ne. Nw., 315 S.W.3d 342, 345 (Mo. banc 2010).  "However, the at-will doctrine is limited in certain respects," including "the public-policy exception to the at-will-employment rule." Id. at 346.  The Missouri Supreme Court adopted the public-policy exception to the at-will employment doctrine as follows:

> An at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated  pursuant to the statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities.

Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 92 (Mo. banc 2010).  "If an employer

terminates an employee for either reason, then the employee has a cause of action in tort for wrongful discharge based on the public-policy exception." Id. An at-will employee may not be terminated for reporting wrongdoing or violations of law to superiors or third parties. Margiotta, 315 S.W.3d at 346. The retaliatory discharge of an employee may give rise to a cause of action under the Missouri public policy exception. See Boyle v. Vista Eyewear, Inc., 700 S.W.2d 859, 871 (Mo. Ct. App. 1985).

To establish a prima facie case for wrongful discharge in violation of public policy based on reporting of wrongdoing to superiors or authorities, Sims must show "participation in a protected activity, a subsequent adverse action by the employer, and some evidence of a causal connection between the protected activity ... and the subsequent adverse action." Schweiss v. Chrysler Motors Corp., 987 F.2d 548, 549 (8th Cir. 1993) (citations omitted).[1] Greif does not dispute that Sims engaged in protected activity by reporting a safety violation to OSHA, or that his employment was terminated (an adverse employment action), thereby satisfying the first and second prongs. Thus, the only issue is whether there is a causal connection between Sims' reporting and his termination.

"To prove a causal connection, a plaintiff must prove that an employer's retaliatory motive played a part in the adverse employment action." Gilooly v. Mo. Dep't of Health & Senior Servs., 421 F.3d 734, 739 (8th Cir. 2005). "[A] causal connection ...is a showing that an employer's retaliatory motive played a part in the adverse employment action." Kipp v. Mo. Highway & Tranp. Comm'n, 280 F.3d 898, 897 (8th Cir. 2002) (internal quotation marks omitted). Motive can be proven by demonstrating (1) the employer had knowledge of the protected conduct, and (2) temporal

---

[1] Circumstantial evidence may be used to establish a causal connection between the protected activity and the subsequent adverse employment action. See Schweiss v. Chrysler Motors Corp., 987 F.2d 548, 549 (8th Cir. 1993).

proximity between the protected activity and the adverse action, though other factors can be used in evaluating intent. Hervey v. County of Koochiching, 527 F.3d 711, 722 (8th Cir. 2008). Direct evidence is not required, rather "[e]vidence that gives rise to an inference of retaliatory motive on the part of the employer is sufficient to prove a causal connection." Id. at 739-40 (quoting Kipp, 280 F.3d at 896-97). "The timing of a plaintiff's discharge in relation to his protected activity can sometimes establish causation for the purpose of establishing a prima facie case." Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000). However, "'[g]enerally more than a temporal connection ... is required to present a genuine factual issue on retaliation.'" Kipp, 280 F.3d at 897 (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)) (the plaintiff's intervening rule violation, which occurred between the time he engaged in protected activity and the time he was terminated, "eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination."). "Instead, the timing of the discharge is usually evaluated in the light of other evidence, or lack of other evidence, in the record." Sherman, 235 F.3d at 410.

In this case, the Court finds the temporal connection between the protected activity and the adverse employment action is "very close" but fails to show a causal connection between the protected activity and adverse employment action. See, e.g., Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) (finding two-week interval between taking FMLA leave and discharge sufficient, but barely so, to prove causal connection between exercise of rights and adverse employment action); Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113-14 (8th Cir. 2001) (noting that a "matter of weeks" between a protected activity and an adverse employment action was sufficient to complete a prima facie case of discrimination). But see Kipp v. Mo. Highway

& Tranp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (noting that a two-month interval between the employee's termination and her retaliation complaint, by itself, was not enough to establish a causal connection as a matter of law). "Our recent cases have, in our view, made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of [retaliation.]" Kipp, 280 F.3d at 897.

Nonetheless, to establish a causal connection, Sims must demonstrate that Greif had actual or constructive knowledge of his protected activity. See Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 715 (8th Cir. 2000); see Simon v. Simmons Foods, Inc., 49 F.3d 386, 389 (8th Cir. 1995) (stating that a plaintiff must show that "the employer had actual or constructive knowledge of the protected conduct" in order to establish a prima face case). "[A] causal link does not exist if the employer is not aware of the employee's statutorily protected activity." Wolff v. Berkley Inc., 938 F.2d 100, 103 (8th Cir. 1991) (stating that a causal link between statutorily protected activity and an adverse employment action "does not exist if the employer is not aware of the employee's statutorily protected activity."). The record clearly shows that the decision maker, Cahail, was not aware that Sims had contacted OSHA when she decided to terminate him for committing a fourth Safety Rule violation. Therefore, as a matter of law, Sims cannot establish a causal connection between his protected activity and Greif's termination decision. See Buettner, 216 F. 3d at 715. Absent any additional evidence of causation, the undersigned concludes that Sims has failed to establish this element of his prima facie case of retaliation.

Even if the Court were to assume that Sims had established a prima facie case, Greif has articulated a legitimate nondiscriminatory reason for Sims' termination, and therefore, successfully rebutted it with its nondiscriminatory reason for his termination. Once a plaintiff establishes a prima

facie case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action." Macias Soto v. Core-Mark Int'l, Inc., 521 F.3d 837, 841 (8th Cir. 2008). If the defendant presents such a reason, the plaintiff must prove that it is a pretext for retaliation. Id. Certainly, and as the Eighth Circuit has "repeatedly held," "insubordination and violation of company policy are legitimate reasons for termination." Putnam v. United Health Sy., 348 F.3d 732, 746 (8th Cir. 2003) (quoting Kiel v. Select Artificial, Inc., 169 F.3d 1131, 1135 (8th Cir. 2003)).

Sims has produced no evidence demonstrating that his contacting OSHA was a factor in his termination. Indeed, the instant record shows Greif terminated Sims after repeated and documented safety violations. "[T]he anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules...." Kiel, 169 F.3d at 1136. Sims has offered no evidence showing this his termination was the result of his contacting OSHA. Indeed, Sims' assertion that his belief is "a mental thing" stemming from butting heads with Cahail is insufficient evidence as a matter of law to create a genuine issue of material fact to defeat summary judgment.

On the record, the undersigned finds that Greif has articulated legitimate reasons and addressed employment-related concerns issuing the violations and do not evidence that Greif inappropriately and without cause terminated Sims. Kim v. Nash Finch Co., (holding that a "jury could have reasonably found that [the employer] placed the written reprimand[s] in [the employee's] personnel file in order to discredit [the employee] when [there was an investigation of] his employment discrimination charge."). "[T]he anti-discrimination statues do not insulate an employee from discipline for violating the employer's rules or disrupting the work-place." Griffith v. City of Des Moines, 387 F.3d 733, 738 (8th Cir. 2004) (quoting Kiel v. Select Artificials, Inc., 169 F.3d

1131, 1136 (8th Cir. 1999). In the twelve months prior to his termination, Sims committed at least four Safety Rule violations and then the Safety Rule violation on August 5, 2009 resulting in his termination. Indeed, Sims testified that he understood that violation of the Safety Rules could result in termination of employment including operating a machine without safety guards. Thus, the burden shifts to Sims to present evidence of pretext. Specifically, Sims bears the burden of establishing that this proffered reason is pretextual, which he has not done. Sims has not produced any evidence that creates a question of fact regarding whether Greif's stated reason for his termination is pretextual. Further, Sims has not produced any evidence to create a reasonable inference that Greif acted in retaliation. See Putman v. Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003) (noting that to establish pretext, a plaintiff must "substantiate [her] allegations with sufficient probative evidence [that] would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy."). On the record, it is clear that Sims was terminated as a result of his own misconduct, and Greif is entitled to summary judgment. See Mitchell v. Iowa Protection & Advocacy Serv., Inc., 325 F.3d 1011, 1014 (8th Cir. 2003) (holding the plaintiff failed to establish a casual connection between her protected activity and her termination where the decision makers were not aware of the protected activity that the plaintiff alleged was the basis for the retaliation against her). Sims admitted that he committed a Safety Rule violation, which he knew could result in his termination.

With regard to pretext, there is insufficient evidence from which a jury could determine that Greif's stated reason for Sims' termination was pretextual. Sims has offered insufficient evidence to undermine the substantial evidence offered by Greif showing that he was terminated for Safety Rule violations C*f*. Schweiss,, 987 F.2d at 550 (awarding summary judgment to employer on retaliatory discharge claim when employee failed to present evidence undermining employer's proffered reason

for the discharge). Indeed, Sims testified that he understood he was required by Greif's Safety Rules to "keep all guards and safety devices in place and properly adjusted," and he committed a Safety Rule violation on August 5, 2009 that led to his termination inasmuch as that violation caused Sims to exceed Greif's progressive discipline policy. Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994) ("Defendant's identification of the four alleged infractions sufficiently set forth legitimate, non-discriminatory reasons for plaintiff's discharge."). A reasonable finder of fact would determine that Sims' four violations of Greif's Safety Rules caused his termination, and his contacting OSHA was not a contributing factor in the decision to terminate his employment. The undisputed evidence shows that Sims was terminated for his repeated violations of Greif's Safety Rules. Sims has offered no evidence showing that any of the Safety Rule violations issued to him were unwarranted. Indeed, Sims admitted to committing each Safety Rule violation that led to his discharge, i.e., operating the Punch Press machine without all the safety guards properly installed. The evidence shows that the sole cause of his termination was his repeated violations of the Safety Rules causing him to exceed Greif's progressive discipline policy, and Sims has provided no evidence to the contrary. See Rose-Matson v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998) (pretext may be shown directly, by showing that the employer was more likely motivated by a discriminatory reason, or indirectly, by showing that the employer's explanation is unworthy of credence).

Whereas Sims himself believes he was subjected to unprecedented scrutiny, he has presented no specific, tangible evidence that he was treated differently or Greif enforced rules more harshly against him. The only evidence to which Sims points in asserting that Greif's stated reason for his termination was pretextual are his own self serving allegations and speculations, which are wholly

insufficient to create an issue of fact. Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994) (affirming summary judgment where "plaintiff presented no such evidence other than his own unsubstantiated allegations in deposition"); accord Smith v. Int'l Paper Co., 523 F.3d 845, 848 (8th Cir. 2008) (holding, in a discrimination case, that "'[a] plaintiff may not merely point to unsupported self-serving allegations'" to defeat summary judgment). Indeed, Sims' assertion that he was never disciplined for operating the Punch Press machine without guards from 2007-2009 is disingenuous inasmuch as the record shows that the temporary guards were not installed until May 2009. Viewing the facts and inferences from the facts in the light most favorable to plaintiff, the Court finds no evidence that creates a reasonable inference that Sims' contacting OSHA was the determinative factor in Greif's decision to terminate him, nor does the Court find any evidence that could support an inference of pretext. Unsubstantiated and conclusory allegations are insufficient to support an inference of pretext, and cannot create a genuine issue of material fact precluding summary judgment. See Rose-Matson, 133 F.3d at 1109.

**IT IS HEREBY ORDERED** that Defendants Greif, Inc. and Trilla St. Louis Corp.'s Motion for Summary Judgment (Docket No. 26) is GRANTED.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this   23rd   day of November, 2011.